**QUICKIE, LLC, Plaintiff,**

v.

**MEDTRONIC, INC., Defendant.**

**No. 02 CIV.1157 (GEL).**

United States District Court,
S.D. New York.

Sept. 30, 2002.

Todd S. Sharinn, Paul J. Sutton, William Todd, Scott Bornstein, Greenberg Traurig, L.L.P., New York City, for Plaintiff.

Chryssa V. Valletta, McDermott, Will & Emery, New York City, Raphael V. Lupo, Donna M. Tanguay, Brian E. Ferguson, Stephen K. Shahida, McDermott, Will & Emery, Washington, DC, for defendant.

### ORDER

LYNCH, District Judge.

On May 23, 2000, the Patent and Trademark Office issued to Quickie, LLC ("Quickie"), as assignee of the inventors, United States Letters Patent No. 6,066,160 ("'160 Patent"), entitled "Passive Knotless Suture Terminator For Use in Minimally Invasive Surgery and to Facilitate Standard Tissue Suturing." Quickie filed this patent infringement action on February 13, 2002, claiming that Medtronic, Inc. ("Medtronic"), with whom it had previously entered into an agreement for the "mutual exchange of confidential information concerning the development, manufacture, and marketing of certain technologies" (Pl. Mem. at 1), infringed the '160 Patent by selling a device for retaining sutures. Having filed briefs and appeared for a *Markman* hearing on September 4, 2002, to discuss the key disputed terms (aperture, upper/lower/outer surfaces, first and second longitudinal directions, and cavity), the action is now before the Court on claim construction.

"[A] patent must describe the exact scope of an invention and its manufacture," as defined by the claims. *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 373, 116 S.Ct. 1384, 134 L.Ed.2d 577

(1996). "[C]onstruction of a patent ... is exclusively within the province of the court." *Id.* at 372, 116 S.Ct. 1384. The Court's purpose is to determine "what the words in the claim mean." *Id.* at 374, 116 S.Ct. 1384. A simple patent case has two elements, "construing the patent and determining whether infringement occurred." *Id.* at 385, 116 S.Ct. 1384. "The first is a question of law, to be determined by the court, construing the letters-patent, and the description of the invention and specification of claim annexed to them." *Id.* (internal citation omitted). In undertaking that task, "[i]t is well-settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996). The Court should "look to the words of the claims themselves" giving them "their ordinary and customary meaning" unless clearly stated otherwise. *Id.; see also Dow Chem. Co. v. Sumitomo Chem. Co. Ltd.,* 257 F.3d 1364, 1372 (Fed. Cir.2001) (disputed terms are given "their ordinary and accustomed meaning as understood by one of ordinary skill in the art"). The specification "is the single best guide to the meaning of a disputed term." *Vitronics,* 90 F.3d at 1582. If intrinsic evidence resolves disputes over meaning, it is improper to look at extrinsic evidence, although the court can hear it as long as no weight is later given to that evidence. *Id.* at 1583–84. Extrinsic evidence may be used "to help [the court] understand the underlying technology." *Id.* at 1585.

This Order defines the disputed terms pursuant to the legal standard stated above. The '160 Patent protects an invention designed to hold sutures in place without requiring a surgeon to tie or knot the sutures. ('160 Patent, col. 1, lines 10–14.) Although other devices exist as "alternatives to conventional knot-tying tech-niques" (col. 2, lines 27–33), the '160 patent criticizes the prior art for flaws such as requiring "pinpoint accuracy" (col. 2, lines 34–44) or for using "small loose parts ... [that are] easy to drop and lose" (col. 2, lines 58–64). The device disclosed in the '160 Patent claims to "offer ... ease and versatility for terminating sutures and thus securely locking tissues and/or prosthetics in place" that prior devices cannot. (Col. 3, line 66—col. 4, line 2.)

As was readily apparent during the *Markman* hearing, the parties' dispute is predominately about the meaning of the word "aperture." Minor disputes also exist as to the meanings of the terms "cavity," "longitudinal directions," and "upper, lower, and outer surfaces." At the most basic level, the parties are fighting about the scope of the patent. Medtronic would have the Court limit the invention to a device with at least one, "fully enclosed" aperture and with narrow limitations on shape and spacial orientation. Quickie seeks "the broadest construction of these claims reasonable." (Pl. Mem. at 13.)

There are two independent claims at issue, claims 13 and 33. Taking claim 13 as representative of the use of the words in the patent, the invention is "an apparatus body having *a upper surface, a lower surface, an outer surface,* and at least one *aperture,* the aperture having a *longitudinal axis extending from the upper surface to the lower surface* and defining an aperture surface, wherein a *first longitudinal direction* and *a second longitudinal direction* thereof each extends along the longitudinal axis in opposite directions." (Col. 15, lines 5–12) (emphasis added). Moreover, the aperture has a "middle portion [with] a first surface and second surface opposing each other and is wider than either of the upper portion and the lower portion and forms a *cavity* therein; and (b) a movable cam member [is] disposed in

the middle portion of the aperture." (Col. 15, lines 20–25.)

Medtronic describes the Quickie invention as "a disk-shaped body having at least one hole ('aperture') through it, with a 'cavity' located inside the body and in which is housed a movable 'cam member' that alternatingly allows and restricts passage of a suture through the hole (aperture) in the body," and points to Figs. 5 and 7 in the patent. (Def. Reply at 1.) Medtronic argues that this embodiment of the device is "the only structure shown and described in the '160 patent that corresponds to the asserted claims." (*Id.* at 2.) Consistent with this structure, defendant argues that (1) the aperture must be "fully enclosed," meaning a hole through the device as opposed to any other opening, such as a crenelation, (2) the device must be disk-shaped with parallel upper and lower surfaces, (3) the cavity must be fully enclosed within the aperture, and (4) the longitudinal directions must run north-south. Quickie, in contrast, argues that the drawings in Figs. 5 and 7 merely represent one example of a device embodying the patented invention, and point to case law holding that the "law does not require the impossible. Hence it does not require that an applicant describe in his specification every conceivable and possible future embodiment of his invention." *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed.Cir.1985). (*See also* Pl. Reply at 2–3.)

To support its narrow construction, Medtronic focuses on Figs. 5 and 7 and on language in the claims describing the movable cam member as "captured" within the aperture. (*See, e.g.*, Sept. 4, 2002, Tr. at 43.) Emphasizing that the cam member must be "disposed *in* the middle portion of the aperture" (col. 15, lines 24–25) (emphasis added), or *"therein"* (col. 18, lines 9–13) (emphasis added), or *"captured* within the cavity, since the largest dimension of

the cam member is larger than either end opening of the aperture" (col. 11, lines 15–17); and that the main criticism of the prior art was harm caused by the cam member falling out (*see, e.g.*, col. 2, lines 58–67, col. 3, lines 25–34, col. 3, lines 36–48, and col. 3, lines 52–65), Medtronic correctly argues that the aperture cannot be "just any opening" (Tr. at 45).

■ Because these functional constraints are essential to the claimed invention, Quickie goes too far in its assertion that the meaning of the term "aperture" is "unqualified," or encompasses "any three-dimensional opening, space or channel" (Tr. at 10). However, none of the intrinsic evidence warrants as narrow a definition of "aperture" as the one offered by Medtronic. An "aperture" need not by definition be "fully enclosed" in the sense argued by Medtronic, but rather includes any form of opening. The only justification for reading the term more narrowly here is that the very essence of the invention described requires a spatial configuration of the various parts that will "capture[ ]" the cam within the device and prevent its falling out. Such configurations can be of various types, and still fit comfortably within the language of the claims. Therefore, there is no reason in evidence intrinsic to the patent to require, as Medtronic suggests, that the "aperture" be "fully enclosed." The patent fairly contemplates and covers any shape with the requisite "spatial relationship[s]" (col. 11, line 20) between the cam member, cavity, and aperture, and is not limited to the embodiment shown in Figs. 5 and 7, so long as the cam is contained within the device as a result of the spatial configuration of the aperture.

■ As to the remaining disputes about the shape of the patented device, Medtronic's construction is again too narrow. Medtronic would limit the apparatus to a

three-dimensional, disk shape with parallel upper and lower surfaces and with an aperture going through the entire device running in a north-south direction. But the patent requires neither a disk shape nor parallel upper and lower surfaces. It simply mandates a shape with three surfaces (upper, lower, and outer). The terms "first and second longitudinal directions" mean simply opposing directions, and not anything more specific, such as 180–degree angles, A "cavity" is simply an opening in the aperture—regardless of whether the aperture is fully enclosed—which houses the cam member and whose width is larger than the opening of aperture to prevent the cam member from falling out.

### CONCLUSION

The Court rejects defendant's construction of the disputed terms and adopts plaintiff's construction, with the limitation that "aperture" encompasses not any opening, but rather one that creates a spatial relationship between the movable cam and aperture walls, as described in the patent, that ensures capture of the cam within the aperture.

SO ORDERED.